**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 2, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DUNKIN' DONUTS
INCORPORATED, a Delaware
corporation, and DUNKIN' DONUTS
USA, INC., a Michigan corporation,

Plaintiffs-Appellees,

v.

SHARIF, INC., a New Mexico
corporation, RAHIM SHARIF and
ANISA SHARIF, husband and wife,

Defendants-Appellants.

No. 04-2272
District of New Mexico
(D.C. No. CIV-03-0925 JP/RLP)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **BRORBY**, and **McCONNELL**, Circuit Judges.

This case stems from a dispute between Dunkin' Donuts, Inc. ("Dunkin'

Donuts") and a franchisee, Sharif, Inc., who stopped making its payments but

sought to retain the right to sell the franchise. Dunkin' Donuts filed this lawsuit

against Sharif, Inc., Mr. Rahim Sharif, and Mrs. Anisa Sharif (collectively

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

"Sharif"), claiming trademark infringement, unfair competition, and breach of contract. Sharif counterclaimed, arguing that Dunkin' Donuts, by not allowing Sharif to sell its franchise interest, had breached its duty to mitigate damages, breached the franchise agreement, and breached its duty of good faith and fair dealing. The district court entered summary judgment in favor of Dunkin' Donuts and dismissed Sharif's counterclaims. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM**.

## I. BACKGROUND

Dunkin' Donuts entered into a Franchise Agreement with Sharif on February 1, 1986. As part of the Franchise Agreement, Dunkin' Donuts granted Sharif the right to operate a Dunkin' Donuts shop in Albuquerque, New Mexico. Defendants Rahim and Anisa Sharif personally guaranteed all of the obligations that Sharif, Inc. might incur under the Agreement. The 1986 Franchise Agreement expired on January 3, 2000, but Sharif continued to operate the store under the agreement on a month-to-month basis.

Sharif subsequently failed to pay various fees owed to Dunkin' Donuts under the franchise agreement, thereby defaulting on the agreement. As a result of repeated defaults, Sharif executed a promissory note to Dunkin' Donuts on January 30, 2001 for the amount of money owed. Soon thereafter Sharif defaulted on the January 2001 promissory note.

On October 11, 2001 the parties entered into a settlement agreement related to Sharif's default on the promissory note. The settlement agreement replaced the January 2001 promissory note with one dated October 11, 2001, which set forth a new payment schedule for the amount owed to Dunkin' Donuts. The settlement agreement also stated that the parties would execute a new franchise agreement and acknowledged that Sharif had already paid the $5000.00 franchise renewal fee. The parties dispute whether Sharif ever renewed the Franchise Agreement. It is undisputed, however, that Sharif continued to operate the franchise based on the terms of the 1986 Franchise Agreement, since the renewal agreement simply extended the term of the original Agreement.

After entering into the October 11, 2001 settlement agreement, Sharif repeatedly failed to make the required money payments under the Franchise Agreement and the October 2001 promissory note. On December 20, 2002, Dunkin' Donuts informed Sharif that it would terminate the Franchise Agreement on February 1, 2003 for Sharif's failure to cure defaults. Dunkin' Donuts never took action on its threat, however, and after February 1, 2001 Sharif continued operating under the 1986 Franchise Agreement. Two months later, on April 5, 2003, Sharif stopped reporting weekly gross sales to Dunkin' Donuts and ceased paying the fees owed under the Franchise Agreement. Moreover, on May 1, 2003, Sharif failed to make the final payment of $41,967.91 on the October 2001

promissory note. Dunkin' Donuts sent Sharif a final "Notice to Cure" on June 10, 2003, which gave Sharif fifteen days to cure the defaults. Sharif failed to do so, and on July 8, 2003, Dunkin' Donuts formally notified Sharif that the Franchise Agreement was terminated.

Sharif nevertheless continued to operate its Albuquerque store as a Dunkin' Donuts shop. On August 7, 2003, Dunkin' Donuts filed this lawsuit seeking injunctive and monetary relief for breach of contract, trademark infringement, and unfair competition. Sharif concedes that it owes money to Dunkin' Donuts under the Franchise Agreement and promissory note, that Dunkin' Donuts terminated the Franchise Agreement on July 8, 2003, and that it failed to meet its obligations under the post-termination provisions of the Franchise Agreement.[1] Sharif filed three counterclaims against Dunkin' Donuts, however, alleging that it failed to mitigate damages, breached its duty of good faith and fair dealing under the Franchise Agreement, and breached the Franchise Agreement in bad faith.

The gravamen of Sharif's counterclaims is that Dunkin' Donuts wrongfully prevented it from selling its franchise interest to Mr. Razzak Gauba, a deal that allegedly would have satisfied its obligations to Dunkin' Donuts while allowing it

---

[1]The Franchise Agreement required that upon termination, Sharif had to stop using Dunkin' Donuts trademarks, proprietary marks, the Dunkin' Donuts system, and Dunkin' Donuts operating manuals. The Franchise Agreement also contains a covenant against competition.

to make a profit on the sale. Mr. Gauba, the potential buyer, owned several other Dunkin' Donuts shops in the Albuquerque area. On June 25, 2003, Mr. Rahim Sharif and Mr. Gauba signed an "informal proposal" wherein Sharif would transfer its franchise interest in the Dunkin' Donuts shop to Mr. Gauba. In exchange, Mr. Gauba would pay Sharif $90,000, assume its debt under the October 11, 2001 promissory note, and pay the balance on the note at the time of closing. The agreement states that it is contingent on Dunkin' Donuts' approval and the transfer of the lease by the landlord. Mr. Sharif claims that just prior to his signing the informal purchase agreement, Mr. Gauba told him that Dunkin' Donuts had said he would be a "viable candidate" for purchasing a new Dunkin' Donuts shop in Albuquerque. App. 402. Dunkin' Donuts never approved the proposed transfer, however, and no formal agreement to sell the franchise was ever executed.

Under the 1986 Franchise Agreement, Sharif could not transfer its interest in the franchise without Dunkin' Donuts' prior written consent, and the Agreement required Sharif to satisfy all of its accrued money obligations to Dunkin' Donuts before any transfer or sale. Franchise Agreement ¶¶ 10B, 10B(4). At the same time, Dunkin' Donuts was not allowed to "unreasonably withhold its consent to any transfer . . . , provided, however: . . . [t]he transferee .

. . shall have a good credit rating and business qualifications reasonably acceptable to Dunkin' Donuts." *Id*. ¶¶ 10C, 10C(2)(a).

After receiving the final "Notice to Cure" letter on June 10, 2003, Mr. Sharif claims that he repeatedly called and left messages with various officials at Dunkin' Donuts in an attempt to receive its approval of the transfer to Mr. Gauba. Yet he alleges that Dunkin' Donuts failed to return his calls, and then terminated the Franchise Agreement on July 8, 2003 without giving fair consideration to his proposed transfer to Mr. Gauba.

Dunkin' Donuts submitted affidavits from several employees at the company explaining why it decided not to consent to the informal purchase agreement between Mr. Sharif and Mr. Gauba. Foremost on its list of reasons for withholding consent was that Mr. Gauba was in default on his existing franchise agreement with Dunkin' Donuts. An affidavit from Mr. Gary Zullig, a Collections Case Manager at Dunkin' Donuts, states that Mr. Gauba failed to report the gross sales of his Dunkin' Donuts shop or pay the fees owed to Dunkin' Donuts for the week ending May 24, 2003, and every week thereafter. An affidavit from Mr. Allen White, a Franchise Services Manager at Dunkin' Donuts, confirmed that Mr. Gauba "was in default to Dunkin' Donuts . . . and his defaults were continuing and increasing during that period." App. 279. Dunkin' Donuts produced an Accounts Receivable Status Report for Mr. Gauba's store that

supported the testimony of Mr. Zullig and Mr. White. The Report showed that Mr. Gauba had been in default on his Franchise Agreement since May 28, 2003, and that as of August 27, 2003, he owed Dunkin' Donuts an estimated $7,938.82. The amount due could only be estimated because Dunkin' Donuts calculates its fees based on weekly gross sales, and Mr. Gauba had stopped reporting the sales figures from his store.

There is conflicting evidence regarding whether Mr. Gauba remained interested in purchasing Sharif's franchise interest after signing the June 25, 2003 informal purchase agreement. On August 13, 2003, Keith Bakker, a Dunkin' Donuts representative, contacted Mr. Gauba to ask about the informal purchase agreement with Mr. Sharif. According to Mr. Bakker, Mr. Gauba said that he could no longer afford to purchase Sharif's franchise interest. Sharif responded to the Bakker Affidavit by producing a notarized letter signed by Mr. Gauba on September 15, 2003 stating that he was still interested in purchasing Sharif's franchise interest. Less than a month later, however, on October 6, 2003, Mr. White spoke with Mr. Gauba and claims that Mr. Gauba said he had not further pursued purchase of the Sharif franchise because he could not obtain sufficient financing.

In any event, Dunkin' Donuts claims that it remained convinced that Mr. Gauba was not an acceptable buyer. On September 2, 2003, Dunkin' Donuts sent

Mr. Sharif a letter proposing a settlement agreement that would reinstate the Franchise Agreement for a six-month period to allow Sharif to sell its franchise interest to a "suitable buyer." App. 399. Sharif rejected the offer on September 7, 2003 because it did not grant permission for the transfer to Mr. Gauba.

On November 20, 2003, the district court issued a preliminary injunction against Sharif enjoining it from any further use of Dunkin' Donuts trademarks, proprietary marks, business systems, and operating manuals, and from violating the covenant of non-competition contained in the 1986 Franchise Agreement. In response, Defendants closed their Dunkin' Donuts shop on November 24, 2003. Dunkin' Donuts therefore seeks only monetary relief at this time.

Dunkin' Donuts moved for partial summary judgment on February 4, 2004. It asked the court to grant summary judgment on its breach of contract claims related to the Franchise Agreement and October 11 promissory note, and to dismiss Sharif's counterclaims for failure to mitigate, breach of contract, and breach of the duty of good faith and fair dealing. Although Sharif admitted to defaulting on the Franchise Agreement and October 11 promissory note, it argued that Dunkin' Donuts could no longer enforce those agreements because it had acted in bad faith by refusing to approve the transfer agreement. Sharif also reasserted its request for monetary and injunctive relief under the counterclaims.

On May 26, 2004, the district court granted Dunkin' Donuts' partial summary judgment motion. The court noted that Sharif's defense to the breach of contract claims and its counterclaims are all based on the same allegation: that Dunkin' Donuts breached the Franchise Agreement by unreasonably withholding consent to Sharif's proposed transfer of its franchise interest to Mr. Gauba. The district court found that Dunkin' Donuts did not unreasonably withhold consent to the proposed transfer of the Sharif franchise for the following reasons: (1) Sharif did not comply with the Franchise Agreement's requirement that all outstanding money obligations be satisfied before transfer; (2) Sharif's breach of the Franchise Agreement relieved Dunkin' Donuts from its duties under the Agreement; (3) the landlord did not approve the transfer of the lease as required by the informal proposal to sell the Sharif franchise to Mr. Gauba; and (4) it was reasonable for Dunkin' Donuts not to approve a buyer who was already in default of his own franchise agreement. Sharif now appeals the district court's order granting partial summary judgment to Dunkin' Donuts. We AFFIRM.

## II. DISCUSSION

We review de novo the district court's grant of partial summary judgment, applying the same standard used by the district court. *Simms v. Oklahoma ex rel Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is appropriate if the evidence, viewed in the light

most favorable to the nonmoving party, shows that "'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). There is a genuine issue of material fact if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir. 1996).

The crux of Sharif's argument is that Dunkin' Donuts improperly withheld its approval of Mr. Gauba as purchaser of the Sharif franchise. Sharif claims that under the Franchise Agreement Dunkin' Donuts acted unreasonably in not approving the sale.[2] The district court found that Sharif's argument fails for at least four independent reasons. We need accept only one of those reasons to affirm the judgment below.

The district court found that no reasonable jury would find that Dunkin' Donuts acted unreasonably by withholding its consent to the June 25, 2003 informal purchase agreement when Mr. Gauba, the proposed buyer, was in default under his own franchise agreement with Dunkin' Donuts. We agree. Under the Franchise Agreement, Dunkin' Donuts was not allowed to "unreasonably withhold

---

[2]Sharif also argues that its right to sell the franchise interest extended beyond the termination of the Franchise Agreement, claiming that the Agreement was similar to a mortgage on a house, where even if you default, you still retain a property interest in the proceeds from the sale of the home. We find no merit to this argument. The terms of the Franchise Agreement allow Dunkin' Donuts to terminate the contract upon default of the franchisee, and provide for the extinguishment of the franchise relationship upon termination. ¶ 9.

its consent to any transfer" as long as "[t]he transferee . . . shall have a good credit rating and business qualifications reasonably acceptable to Dunkin' Donuts." *Id*. ¶¶ 10C, 10C(2)(a). At the time of the proposed sale, Mr. Gauba owned several Dunkin' Donuts stores. Dunkin' Donuts produced affidavits from two of its employees stating that Mr. Gauba failed to report the gross sales of one of his shops and to pay the fees owed for the week ending May 24, 2003, and every week thereafter. It also produced an Accounts Receivable Status Report for Mr. Gauba's store, which showed that Mr. Gauba had been in default on his franchise agreement since May 28, 2003. Under these circumstances, we agree with the district court that no reasonable jury could conclude that Dunkin' Donuts violated the Franchise Agreement by unreasonably withholding its consent to the June 25, 2003 proposed transfer agreement.

Sharif argues that the Accounts Receivable Status Report and the "self-serving statements" contained in the affidavits violate the "best evidence rule" because they provide "only 'estimates' of 'accounts receivables'" rather than "actual accounts receivables." Aplt. Br. 25–26. It is unclear how this argument is relevant to the district court's holding, since the critical issue is whether Mr. Gauba had defaulted on the franchise agreement, not the precise amount of his indebtedness. Regardless, the "best evidence rule" does not help Sharif in this case. Mr. Zullig, a Dunkin' Donuts Collections Case Manager, explained in his

affidavit that the fees charged by Dunkin' Donuts to its franchisees are calculated based on the gross weekly sales of each shop. Dunkin' Donuts could only estimate the fees owed by Mr. Gauba because he had stopped reporting the gross weekly sales at one of his stores.

Sharif also contends that it should be "afforded a reasonable opportunity to respond to [the] allegations" about Mr. Gauba's financial status because Dunkin' Donuts has "conspicuously refused [its] requests to provide the very financial documents which [Dunkin' Donuts] alleges would support [its] position that buyer is allegedly not financially viable." Aplt. Br. 27. Other than Sharif's bare accusation, however, nothing in the record supports its claim that Dunkin' Donuts is withholding relevant discovery materials.[3] The Accounts Receivable Status Report for Mr. Gauba's shop provided sufficient documentary support for the district court's holding.

Sharif's last argument is that the court should have postponed ruling on Dunkin' Donuts' partial summary judgment motion until after Mr. Gauba responded to the subpoena requiring him to produce certain documents related to

---

[3]Sharif points to a September 12, 2003 letter sent from Dunkin' Donuts' counsel related to its settlement offer from the week before. In that letter, Dunkin' Donuts stated that because "Mr. Gauba has told Keith Bakker of Dunkin' that he is no longer interested[, it] therefore need not reach the issue of Mr. Gauba's qualifications." App. 415. This statement does not constitute a refusal by Dunkin' Donuts to produce financial documents related to Mr. Gauba.

his financial status. Sharif failed to raise this point before the district court in its Response Motion to Dunkin' Donuts motion for partial summary judgment. The argument is therefore waived for purposes of Sharif's appeal of the district court's summary judgment order, *see Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1175 (10th Cir. 2005).

The judgment of the district court is **AFFIRMED**.

Entered for the Court,

Michael W. McConnell
Circuit Judge